**James W. CAMPBELL, Plaintiff,**

v.

**BANKBOSTON, N.A., Bankboston Separation Pay Plan and its Administrator Helen Drinan, and the Bankboston Cash Balance Retirement Plan and its Administrator, the Retirement Committee, Defendants.**

No. 99–CV–12543–MEL.

United States District Court, D. Massachusetts.

May 17, 2002.

Robert O. Berger, III, Boston, MA, for Plaintiff.

Robert B. Gordon, Crystal D. Talley, Ropes & Gray, Samuel B. Goldberg, Barron & Stadfeld, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

LASKER, District Judge.

James W. Campbell sues BankBoston, N.A. ("BankBoston"), BankBoston Separation Pay Plan ("SPP") and its Administrator Helen Drinan, and the BankBoston Cash Balance Retirement Plan ("Retirement Plan") and its Administrator, The Retirement Committee, alleging that the defendants: (1) wrongfully denied him SPP severance benefits under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA"); (2) failed to pay the full amount of retirement benefits provided for by the Retirement Plan due to him in violation of ERISA and the Age Discrimination in Employment Act, 29 U.S.C. § 623 ("ADEA"); and, (3) discriminated against him by excluding him from an "early retirement" program. The complaint contains affiliated common law claims for breach of the covenant of good faith and fair dealing and wrongful termination.

The defendants jointly move for summary judgment. The motion is granted.

### I.

Campbell was continuously employed by BankBoston (or its predecessors) from June 19, 1961, until September 30, 1998. During the last four years of his employment, Campbell was employed as a Senior Fiduciary Specialist in BankBoston's Global Asset Management Group, which was part of the trust department, where he

handled BankBoston's institutional custody and trust business.

Three series of events define this dispute. The first occurred in June 1996, when BayBank and Bank of Boston merged to form BankBoston. At that time, an "early retirement" program was created to minimize involuntary layoffs associated with the merger. Campbell and other highly compensated employees (those earning above $66,000 a year) were excluded from this program. Campbell contends that this exclusion amounted to discrimination.

The second of the series of events that led to this lawsuit is the staged conversion of BankBoston's Retirement Plan to a cash balance plan. In the prior version of the Retirement Plan, participants had individual accounts to which they and BankBoston made periodic contributions, and their benefits were expressed under a traditional annuity-based formula. The cash balance plan also gave each participant an account to which annual credits were made, determined as a specified percentage of the employee's salary, but the contributions were not made by the employee, and the plan itself was insured to reduce market risk for plan participants.

The first step in this conversion occurred on January 1, 1989, when the Retirement Plan was amended to provide that future retirement benefits would accrue under a cash balance formula, but prior accruals would be grandfathered under the old annuity-based system. On January 1, 1997, the entire Retirement Plan was switched to a cash balance system and the accrued benefits were converted by calculating their present value and crediting that amount as an opening balance in the new cash balance system. Campbell bases his amended complaint on the second step in the conversion: he alleges that he received fewer benefits than he deserved.

The third and final series of events that generated the remaining counts in Campbell's complaint began in the middle of 1998, when BankBoston sold its institutional trust and custody business to Investors Bank and Trust ("IBT"). The effective date of the sale was October 1, 1998. When BankBoston announced that it was selling the division that Campbell worked in to IBT in July 1998, Campbell was offered continuing employment with IBT after the October 1, 1998 closing. Campbell declined this offer and sought severance benefits under the BankBoston SPP. On September 30, 1998, defendant Helen Drinan, the Plan Administrator of BankBoston's SPP, amended the plan to exclude anyone who refused offers of comparable employment by an acquiring company. Under the provisions of the SPP, Drinan determined that Campbell was ineligible for severance benefits.

The parties have since submitted 97 pages of briefing on the motion for summary judgment, discussed below.

## II.

### A. Count I: Violation of ERISA

Count I of the amended complaint alleges the defendants violated ERISA by failing to pay Campbell the severance pay he was entitled to under the SPP. 29 U.S.C. § 1132(a)(1)(B). The defendants argue that the denial of benefits was authorized under the amended version of the SPP and, if for some reason the amendment was improper or ineffective, it was authorized under the prior version of the SPP.

### 1. Was the Amendment of September 30, 1998 Effective?

The defendants contend that there is no limitation as a matter of law on how an amendment to a severance plan such as

the SPP can be made. Accordingly, the defendants maintain that they were well within their rights when on September 30, 1998, Plan Administrator Drinan amended the SPP to exclude employees who "refuse an offer of employment by ... an employer who acquires any of the assets or operations of a BankBoston company or business." Aff. of Helen G. Drinan, Ex. 13. Since it is undisputed that Campbell refused a job offer from IBT, the defendants assert that under the amended SPP, Campbell was not entitled to benefits.

In response, Campbell contends that the amendment to the SPP on September 30, 1998 "has no bearing on [his] proper entitlement to benefits ...." Pl.'s Memo. in Opp. at 21. His chief argument is that the amendment was made by a fiduciary, Drinan, and that therefore the amendment should not affect him. Instead, argues Campbell, the earlier version of the SPP controls, and under those terms, he contends he was due severance benefits.

■ It is the law that a severance benefit plan such as the SPP provides "welfare" rather than "pension or retirement" benefits. *See* 29 U.S.C. §§ 1002(1) and 1002(2)(A). "Welfare" benefits, which are not vested, can be altered or terminated by an employer at any time. *See, e.g., Gable v. Sweetheart Cup Co., Inc.,* 35 F.3d 851, 855 (4th Cir.1994); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 429–30 (2nd Cir. 1990); *see also Allen v. Adage, Inc.,* 967 F.2d 695, 698 (1st Cir.1992) ("severance pay plans are employee welfare plans, and thus, are not vested"). Moreover, the Supreme Court has ruled that when amending a "welfare" benefit plan, an employer is not acting as a fiduciary. *See Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 444, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *Lockheed Corp. v. Spink,* 517 U.S. 882, 890–91, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *see also Joanou v. Coca–Cola Co.,*

26 F.3d 96, 99 (9th Cir.1994) (employers do not act in a fiduciary capacity when amending or terminating a severance benefit plan).

■ Accordingly, the amendment was permissible, and under the amendment, Campbell was not entitled to severance benefits. This conclusion is buttressed by and in harmony with *O'Leary v. BankBoston,* No. 99–CV–10627 (D.Mass.2000), which addressed this very issue, with the same SPP and amendment scheme, albeit with different plaintiffs. As with Campbell, the plaintiffs in *O'Leary* declined IBT's offer of continuing employment and attempted to get severance benefits instead. Judge· Wolf held: (1) "the September 30, 1998, amendment governs for purposes of this case;" and (2) the 1997 version of the SPP "specifically reserved the right to amend, modify, or discontinue the plan for any reason at any time." *O'Leary* Tr. at 56, 58–59.

Accordingly, summary judgment is granted for the defendants as to count I on this ground. However, the parties have devoted considerable resources to briefing alternative, fall-back positions on this issue, and therefore, they are addressed below.

*2. Was Campbell Entitled to Severance Benefits Under the Earlier Version of the SPP?*

■ If the amendment was somehow improper or ineffective, the defendants argue that the amendment merely codified the prior practice under the SPP, and that therefore, even without the amendment, Campbell was not entitled to severance benefits. The earlier version of the SPP provides that an employee is eligible for benefits "if his or her active employment is terminated as a result of work force reduction or job elimination and he or she has made a reasonable and effective effort to

secure a comparable position . . . ." Aff. of Drinan, Ex. 2 at 1. According to the defendants, the Plan Administrator reasonably found that Campbell was neither "terminated," nor involved in a "work force reduction or job elimination," nor made a "reasonable" effort to obtain a comparable position.

The defendants assert that Campbell was not "terminated" because BankBoston took special efforts to make sure that all employees who were within the division being sold to IBT were offered jobs there, and therefore, Campbell did not suffer an involuntary job loss. The defendants further assert that neither a "work force reduction" nor a "job elimination" occurred here because all of the employees kept their jobs and salaries; only their employer changed. Finally, the defendants contend that Campbell did not make a "reasonable" effort to secure comparable employment because he turned down a perfectly acceptable job at IBT. The earlier version of the SPP defines a "comparable" job as one which requires "a reasonably similar employment background and skill set, has a base salary within 10 percent of current base salary, has a similar work schedule, and is within 30 miles of the employee's work location." Aff. of Drinan Ex. 4. The defendants contend that the IBT job met all of these requirements.

Campbell disputes that he was not "terminated," insisting that the defendants ignore the critical fact that his particular position at BankBoston was eliminated by the sale of his group to IBT, since he was involved in managing regulations only relevant to large banks like BankBoston, and not IBT. He belittles the importance of the phrases "work force reduction" and "job elimination" because the crucial fact is that his own position was eliminated in the transaction between BankBoston and IBT.

Campbell contends that he made a "reasonable and effective effort to secure a comparable position." He construes the term "comparable" to mean "comparable to positions within BankBoston." This interpretation is correct, argues Campbell, because the second part of the disputed sentence allows severance benefits "if no comparable position is available upon his or her return from an approved health-related leave of absence." In that part of the sentence, the term "comparable position" must mean "comparable position within BankBoston" if the sentence is to make any sense: where else would an employee be returning? Further, Campbell points out that there is no evidence that BankBoston ever required employees returning under this second prong to search everywhere for another "comparable position." Finally, Campbell notes that the SPP provides that "[w]here questions arise about job comparability, the manager, in consultation with Human Resources, will make the final decision." He asserts that this sentence means that the manager must be employed by BankBoston, and therefore the "comparable position" must be at BankBoston as well.

■ For plans that give discretion to an administrator, as with the SPP, the standard of review is whether the administrator's decision was "arbitrary or capricious." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 109–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Terry v. Bayer Corp.*, 145 F.3d 28, 37 n. 6 (1st Cir.1998). Accordingly, even if the September 1998 amendment to the SPP were ineffective, under the prior version of the SPP, review of the decision not to award benefits is limited to the question of whether the Plan Administrator made a reasonable interpretation of the SPP. It is clear that she did. Therefore, even if the September 1998 amendment were ineffective, summary

judgment would properly enter for the defendants on count I.

### B. The Retirement Plan

These two counts allege that the conversion of BankBoston's Retirement Plan from a prior system into a cash balance plan violated ERISA with regard to Campbell himself (Count II) and violated the ADEA because the change adversely affected older employees like Campbell (Count VII).

#### 1. Count VII (ADEA Discrimination)

The defendants contend that the ADEA claim is barred for two procedural reasons: (1) this lawsuit was filed three days before Campbell filed his Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in December 1999; and (2) the administrative charge was untimely because it was made beyond the 300 day limitations period. *See* 42 U.S.C. § 2000e–5(e)(1). The defendants note that the switch to a cash balance system was made in 1997, and Campbell concedes he was aware of the change by September 1998 when a series of information sessions were given by BankBoston.

The defendants believe that the ADEA claim also fails on the merits. They argue that Campbell is asserting an adverse impact claim and in the First Circuit adverse impact claims are not actionable under the ADEA. *See Mullin v. Raytheon Co.,* 164 F.3d 696, 703–04 (1st Cir.), *cert. denied,* 528 U.S. 811, 120 S.Ct. 44, 145 L.Ed.2d 40 (1999).

Campbell responds that his claims under the ADEA are not procedurally barred because the actions complained of were part of a continuing pattern and practice and, in any event, the defendants acquiesced in their answer to subject matter jurisdiction in this court. He asserts first that underpayment by the cash balance system was ongoing during the last years of Campbell's employment at BankBoston. Second, he notes that the defendants have admitted in their answer to the amended complaint that "subject matter jurisdiction properly lies in this Court." Ans. to Am. Compl. ¶ 6. Campbell argues that this statement constitutes a waiver of the procedural infirmities that the defendants now seek to exploit. Finally, Campbell points to a letter he received from the EEOC stating that he did not need a Notice of Right to Sue to file suit in federal court for violation of the ADEA.

On the merits, Campbell contests the defendants' characterization of his ADEA claim as a disparate impact claim. Instead, he argues that he has shown, under the burden shifting framework established for discrimination cases, that the defendants specifically targeted older employees because BankBoston could receive cost savings by changing the benefits system. *See Mullin,* 164 F.3d.at 699 (applying burden-shifting framework of Title VII cases to ADEA cases). Campbell contends that he has made a prima facie showing that BankBoston engaged in age discrimination. In support of his position, Campbell points to the report by McQuade Incorporated (consultants hired by BankBoston to evaluate the Retirement Plan), which stated:

> [s]ome older, long-service employees would be grandfathered under the Cash Balance and/or the Prior Plan formula. The more grandfathering that occurs, the greater the cost and complexity. (Note: As of 1/1/94, there were 1,180 employees age 50 with at least ten years of service out of a total active plan population of 11,435).

I Dep. R. on Summ. J., Ex. 4 at 20 (McQuade Incorporated report). He contends that this statement creates at least a triable issue of material fact, as a juror

might disregard the explanations offered by the defendants.

 Because Campbell's claim is procedurally defective and cannot prevail on the merits, the defendants are granted summary judgment as to count VII. Procedurally, Campbell was required to file his charge with the appropriate administrative agency before initiating this lawsuit. 42 U.S.C. § 2000e–5(f). He did not do so. Similarly, Campbell was required to bring his lawsuit before the running of the 300 day limitations period. 42 U.S.C. § 2000e–5(e)(1). He did not meet this deadline. The date by which the 300 day period should be calculated is, at the latest, the date by which Campbell became aware that the Retirement Plan had switched to a cash balance system, which was September 1998. The amended complaint does not describe a pattern and practice of violations, but instead describes a single event—the decision to reformulate the Retirement Plan to a cash balance system. Am. Compl. ¶ 61. Although the EEOC did send a letter to Campbell suggesting that he did not need a Notice of Right to Sue letter, the letter could not amend the law which requires that a plaintiff file a claim of discrimination in the proper administrative agency before bringing suit. Moreover, the defendants have not waived any of these defenses because the third and fourth affirmative defenses in their answer to the amended complaint alleged failure to comply with the statutes of limitations and failure to exhaust the proper administrative remedies.

 Addressing the merits of the ADEA claim, to the extent that Campbell is alleging a "disparate impact" claim based on the fact that older workers will have a smaller amount of time for interest to accrue on their retirement accounts, such a claim is not permitted under the ADEA. *See Mullin,* 164 F.3d at 703–04 (holding that "disparate impact" theory is not available under the ADEA).[1] If Campbell's amended complaint alleges a "disparate treatment" claim, the single sentence in the McQuade Incorporated report is insufficient to establish the defendants' intent to discriminate based on age. Rather, the sentence is an observation of arithmetic truth: grandfathering more employees would in fact cost more money. It does not constitute even prima facie evidence of discriminatory intent, much less the "smoking gun" that Campbell calls the sentence. In short, no reasonable juror could interpret such a statement as an intent to discriminate.

### 2. *Count II (Violation of ERISA)*

 Count II alleges, inter alia, that the conversion of a retirement plan to a cash balance system created a system which gave less time for older workers to accumulate interest, and therefore discriminated against older workers. Campbell points to the Minimum Safeguard Benefit, a provision of Retirement Plan that "guaranteed" benefits for older employees so as to prevent diminution of retirement benefits. Campbell contends that the defendants eliminated the Minimum Safeguard Benefit in 1997, a step which reduced the benefits payable to Campbell by $3,084.02 per year, roughly eleven percent of the benefits Campbell was to receive. This reduction, Campbell claims, was forbidden by Internal Revenue Code § 411(d)(6), 26 U.S.C. § 411(d)(6), and ERISA § 204(g), 29 U.S.C. § 1054(g), which state that an accrued benefit cannot be reduced by a plan amendment.

---

1. ·There is a split among the Courts of Appeals on this issue. Until the split is resolved, the First Circuit's *Mullin* opinion controls in this District.

The defendants assert that the plan simply reflects "the obvious effects of the time value of money," and not intentional discrimination. *See Eaton v. Onan Corp.,* 117 F.Supp.2d 812, 824 (S.D.Ind.2000) (rejecting a similar argument). They also point out that in a previous case about BankBoston's adoption of a cash balance system for another set of employees, the First Circuit rejected the argument that such a change may imply age bias. *See Goldman v. First Nat. Bank of Boston,* 985 F.2d 1113, 1119–20 (1st Cir.1993).

The defendants stress that the amendment did not reduce any accrued benefit, as Campbell's own expert admits. *See* Aff. of Peters ¶ 7. Instead, the defendants insist that the conversion merely credited the benefit accrued at the time of the amendment to each individual's cash balance account. Therefore, they argue that neither Internal Revenue Code § 411(d)(6) or ERISA § 204(g) apply, since no accrued benefit was reduced.

Campbell counters that a question of fact exists as to whether the defendants have drafted around the ERISA requirements to evade their responsibilities to their employees. He contends that if they did so intentionally, there is no need for the benefits to have vested. *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 612, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).

Summary judgment is granted as to count II. The anti-cutback provisions of Internal Revenue Code § 411(d)(6) and ERISA § 204(g) do not apply here. No accrued benefits were reduced by the Retirement Plan being converted to a cash balance system. Campbell was credited with what he had accrued in his Retirement Plan up to the date of the conversion to a cash balance plan, and this conversion does not show any intentional discrimination as to age on the part of the defendants.

## C. Counts III and IV: Breach of the Covenant of Good Faith and Fair Dealing as to the SPP and the Retirement Plan

The defendants argue that these two state law claims for failure to award severance and retirement benefits at the amount Campbell considers appropriate are preempted by ERISA. *See Allen,* 967 F.2d at 698 ("severance plans are employee welfare benefit plans" under ERISA); *Pizzuti v. Polaroid Corp.,* 985 F.2d 13, 14 (1st Cir.1993) (ERISA governs qualified retirement plans).

Campbell replies that the counts are not preempted for two reasons: (1) the claims have not been shown to "relate to" ERISA plans, and (2) the claims are properly interstitial applications between the common law and ERISA. As to the first issue, Campbell contends that these are merely general laws that should not be preempted because they have only an incidental effect on ERISA. *See, e.g., Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 144–46 (2nd Cir.), *cert. denied,* 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989). Second, Campbell points out that the defendants' version of the law would deprive the SPP of all meaning and terms, as the Plan Administrator could simply amend the terms at any time, including ex post facto. Therefore, interstitial common law lawmaking is appropriate here to prevent abuse. *See Nash v. Trustees of Boston Univ.,* 946 F.2d 960, 967 (1st Cir.1991).

It is plain that these two counts are preempted by ERISA, which preempts "any and all states laws insofar as they may or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The two counts fit squarely into that provision, as they both aim to provide recovery for a denial of benefits under a benefits plan. *See Turner v. Fallon Community Health Plan, Inc.,* 953 F.Supp. 419, 424 (D.Mass.), *aff'd,* 127 F.3d 196 (1st Cir.1997), *cert.*

*denied*, 523 U.S. 1072, 118 S.Ct. 1512, 140 L.Ed.2d 666 (1998) (claim of breach of the covenant of good faith and fair dealing preempted by ERISA).

### D. Count V: Discrimination

Campbell alleges in count V that in 1996 he and other highly-paid professionals were not allowed to participate in an "early retirement program" and that he suffered harm as a result. The defendants claim that Campbell's discrimination allegation fails for procedural reasons and on the merits.

On procedural grounds, the defendants first point out that Campbell did not raise this issue before the Massachusetts Commission Against Discrimination ("MCAD") or the EEOC. Second, the defendants note that this lawsuit was filed three days *before* Campbell filed his administrative charge with the EEOC and a week before he filed his charge with the MCAD. Third, even if the administrative charges before the EEOC and the MCAD included the allegations in count V of the amended complaint, the defendants argue that Campbell was untimely in filing the charges. The action complained of occurred in June 1996, but Campbell did not file with the EEOC or the MCAD until December 1999, beyond the six month limitations period established by M.G.L. ch. 151B, § 5, and the 300 day period in ADEA. Finally, because the litigation ' was filed after the three-year limitations period on a state law claim of discrimination had expired, the defendants conclude that it must be dismissed.

On the merits, the defendants assert that the claim fails under the anti-discrimination provision in ERISA. *See* 29 U.S.C. § 1140. They cite *McNab v. General Motors Corp.*, 987 F.Supp. 1115, 1125 (S.D.Ind.1997), *aff'd*, 162 F.3d 959 (7th Cir. 1998), *cert. denied*, 526 U.S. 1115, 119 S.Ct. 1762, 143 L.Ed.2d 793 (1999), for the proposition that ERISA's anti-discrimination section "applies only in instances in which an employer wrongfully alters the employment relationship to prevent benefit rights from vesting." Here, the defendants note that there was no change whatsoever in Campbell's employment status.

Campbell responds that the defendants admitted in their answer to the amended complaint that "subject matter jurisdiction properly lies in this Court." Ans. to Am. Compl. ¶ 6. Campbell argues that this constitutes a waiver to any procedural defects in his claim. Campbell does not squarely address the defendants' arguments on the merits.

■■■ As the defendants prevail on their procedural objections, there is no need to reach the merits of this claim. It is enough that summary judgment should enter on grounds of failure to raise the issue before the appropriate administrative agencies, failure to file within the six month and 300 day limitations periods, and failure to comply with the three-year state statute of limitations. *See Fant v. New England Power Service Co.*, 239 F.3d 8, 12 n. 3 (1st Cir.2001) ("The Massachusetts cases make clear that the 151B charge of employment discrimination that is filed before the MCAD establishes the parameters of the claim in a subsequent civil action in Superior Court."); *Stephenson v. State Street Bank & Trust Co.*, 924 F.Supp. 1258, 1278 (D.Mass.1996) (failure to exhaust); M.G.L. ch. 151B, § 5 (six month limitations period); 42 U.S.C. § 2000e–5(e)(1) (300 day limitations period); M.G.L. ch. 151B, § 9 (three-year limitations period on a state law claim of discrimination).

■■■■ However, Campbell does not prevail on the merits either. "The ultimate inquiry in a Section 510 case is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits." *Barbour v. Dynamics Research Corp.*, 63 F.3d

32, 37 (1st Cir.1995), *cert. denied,* 516 U.S. 1113, 116 S.Ct. 914, 133 L.Ed.2d 845 (1996). Campbell has not adduced any evidence that any of the defendants excluded him from the early retirement plan with a "specific intent" to interfere with his benefits. Accordingly, the defendants are granted summary judgment on this count.

### E. Count VI: Wrongful Termination

 Campbell alleges that he was wrongfully terminated when he was not allowed to continue working for BankBoston in 1998. The defendants argue that this claim fails because Campbell was at all times an at-will employee. They assert that neither of the two exceptions to the employment at-will doctrine apply in this case: (1) Campbell's discharge does not violate a clearly expressed public policy, and (2) Campbell's discharge did not violate an implied covenant of good faith and fair dealing.

Campbell responds by pointing out that he reasonably believed that his employment would continue under the terms stated to him during his employment at Bank-Boston, and therefore he was wrongfully terminated.

Campbell was an at-will employee, and therefore, the defendants are entitled to summary judgment on this issue. *See, e.g., Upton v. JWP Businessland,* 425 Mass. 756, 757, 682 N.E.2d 1357, 1358 (1997) ("The general rule is that an at-will employee may be terminated at any time for any reason or for no reason at all."). There is no clearly established public policy at play here. *See King v. Driscoll,* 418 Mass. 576, 582, 638 N.E.2d 488, 492 (1994). The exception regarding the implied covenant of good faith and fair dealing arose in *Fortune v. National Cash Register Co.,* 373 Mass. 96, 102, 364 N.E.2d 1251, 1256 (1977), which held that an at-will employee may not be discharged if the discharge is designed to evade paying the employee of past, earned, wages. *See also Maddaloni v. Western Mass. Bus Lines, Inc.,* 386 Mass. 877, 438 N.E.2d 351 (1982); *Gram v. Liberty Mut. Ins. Co.,* 384 Mass. 659, 667–72, 429 N.E.2d 21, 26–29 (1981). Here, no evidence supports any such allegation.

### III.

It is understandable that Campbell feels aggrieved by the way that BankBoston treated him after 37 years of service to the bank and its predecessors. However, the question before this court is whether the defendants had the legal authority to act as they did. As explained above at length, I conclude that they did.

Therefore, the defendants' motion for summary judgment is granted and the complaint is dismissed.

It is so ordered.